UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIHAN, INC., a California corporation, DIANA, INC., a California corporation, SOUAD, INC., a California corporation, doing business as AMPM ARCO JAMUL,<br><br>                                   Plaintiffs,<br><br>v.<br><br>AMCO INSURANCE COMPANY, an Iowa Corporation,<br><br>                                   Defendant. | Case No.:  20-CV-97 TWR (WVG)<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>(ECF Nos. 18, 19) |

Presently before the Court are two motions: (1) the Motion for Summary Judgment (ECF No. 19) filed by Defendant Amco Insurance Company ("Amco"); and (2) the Motion for Partial Summary Judgment (ECF No. 18) filed by Plaintiffs Jihan, Inc., Diana, Inc., and Souad, Inc. d/b/a AMPM Arco Jamul ("Plaintiffs") (collectively, "Cross-Motions").  For the reasons set forth below, the Court **GRANTS** Amco's Motion for Summary Judgment and **DENIES** Plaintiffs' Motion for Partial Summary Judgment.

## I.    Background

This insurance coverage dispute arises from two property loss claims ("Claims") submitted by Plaintiffs in connection with their car wash and oil change facility ("Car

Wash") in Jamul, California.  The Claims involve alleged damage to the building structure and certain car wash systems and other equipment caused by a May 15, 2018 electrical fire ("Fire Loss") as well as a second claim for damages resulting from an alleged vandalism incident ("Vandalism Loss") that occurred approximately one month later (collectively, "Losses").  Plaintiffs sought coverage for the Losses under a commercial property insurance policy ("Policy") issued by Amco to Plaintiffs.  Amco partially denied coverage for the Claims based on Amco's contention that Plaintiffs sold the car wash systems, machinery, and other business personal property items to a third party prior to the date of the Losses as well as Policy exclusions for damage caused by wear and tear, negligent maintenance and dishonesty/entrustment.

### A. Leasing and Sale Transactions

Plaintiffs are tenants on a ground lease with Raul Rodriguez for the property located at 13886 Campo Road, Jamul, California 91935 ("Property").  (Amended Joint Statement of Undisputed Material Facts ("Fact") 1, 115.)[1]  The Property includes Plaintiffs' gas station and convenience store, which is not at issue, and the Car Wash.  (Fact 1.)  Plaintiffs purchased the Car Wash equipment in 2002 for approximately $285,000 and constructed the Car Wash on the Property in 2005.  (Fact 2, 4, 121.)

After operating the gas station, convenience store, and Car Wash for several years, Plaintiffs decided to sell the Car Wash business to Haitham Hermiz in April 2016.  (Fact 7, 146.)  On April 6, 2016, Plaintiffs' principal, Souad Yacoub, and Hermiz executed a Business Purchase Agreement ("Agreement") for the Car Wash.  (Fact 7, 147.)  The Agreement states:

> This AGREEMENT shall act as a bill of sale regarding the transfer of assets by SELLER to BUYER which is necessary to carry out this AGREEMENT.

---

[1] The Amended Joint Statement of Undisputed Material Facts is filed at ECF No. 25 and contains some numbered statements of fact that are undisputed by the Parties and other numbered statements of fact that are disputed by a Party.  If a fact is undisputed, the Court will only cite to the numbered "Fact."  If a fact is disputed, the Court will cite to the evidence supporting the fact.

> BUYER [sic] is transferring all assets of the CAR WASH and QUICK LUBE, including, but not limited to, inventory, machinery, furniture, trade fixtures, car wash systems and other equipment, fictitious business names, trade names, logos, signs, and goodwill.  Provided, however, that leasehold improvements are not part of the AGREEMENT, and SELLER shall retain all ownership of said leasehold improvements.  Also included are the tanks used to collect and recycle the water used in the car wash system.

(Fact 9, 148.)  The Agreement states that "BUYER to pay sales taxes as a result of this sale of business, on the value of the fixtures and equipment specified herein."  (Hermiz Decl., Ex. A at 2, ECF No. 18-1.)  The "value of the fixtures and equipment specified herein" is as follows:

> The SELLER and BUYER allocate the purchase price to the following items:
>
> | | |
> |---|---|
> | Sublease | $215,000.00 |
> | Trade Fixtures & Equipment | $4,500.00 |
> | Goodwill | $30,000.00 |
> | Inventory | $500.00 |
> | Total sale price | $250,000.00 |

(*Id.* at 3.)  The Agreement was drafted by Yacoub's attorney.  (Fact 86.)

On the same date, April 6, 2016, Plaintiffs and Hermiz entered into a "Sublease," wherein Hermiz agreed to pay $6,000 per month to rent the building in which the businesses were housed.  (Fact 10.)  The Sublease required Plaintiffs to have "insurance to cover fire damage to the building itself" and Hermiz was required to obtain insurance for "damages for bodily injury and property damage, arising from its business operation on the premises."  (Fact 11.)

On April 14, 2016, Plaintiffs and Hermiz executed a "Bill of Sale" assigning the "Business Goodwill, Furniture, Fixtures, Equipment, Machinery, Logos, Signs, and Inventory of Stock in Trade" of the Car Wash.  (ECF No. 18-3 at 146.)  The Car Wash inventory attached to the Bill of Sale lists three items totaling $46.30.  (ECF No. 18-3 at 149.)  Plaintiffs and Hermiz amended the allocation of the $250,000 purchase price the of the Car Wash as follows: $1,229.85 for fixtures and equipment, $33,420.95 for goodwill, $349.20 for inventory and supplies, and $215,000 for the sublease.  (ECF No. 18-3 at 151.)

On July 25, 2016, Hermiz sold the Car Wash business to Salah Polus.  (Fact 13.)  An Assignment and Assumption of Sublease Agreement was signed and entered into between Hermiz, Polus, and Yacoub, on August 23, 2016 assigning the Sublease for the Car Wash building from Hermiz to Polus.  (Fact 14.)  As required by the Sublease, Polus obtained an insurance policy issued to the Car Wash by State Farm Insurance Company ("State Farm") in effect for the period December 7, 2017 to December 7, 2018.  (Fact 19.)  Tax records for the Property show that Polus paid taxes on the business personal property related to the Car Wash business.  (Fact 79.)  County tax records reflect that Yacoub paid taxes on real property improvements.  (Fact 80.)

**B. Losses and Insurance Investigations**

On May 15, 2018, there was a fire at the Property which started in the controller room located in the Car Wash tunnel area as a result of an electrical malfunction in a junction box.  (Fact 21.)  The fire damaged the Car Wash controller room including the control panel, ceiling framing, roof covering, building electrical, and car wash controller equipment located in the controller room.  (Fact 172-74.)  None of the machinery or equipment located outside of the controller room in the Car Wash was damaged by the fire. (Fact 23.)

On May 16, 2018, Yacoub reported the Fire Loss to AMCO and AMCO assigned Carolyn Johnson Gray as the adjuster.  (Fact 24.)  Polus likewise tendered the Fire Loss to his insurer, State Farm.  (Fact 25.)  On May 22, 2018, Yacoub spoke with Johnson Gray and requested that AMCO "cancel the claim" because Yacoub's "tenant [wa]s going to make a claim under his insurance."  (Fact 26.)  Polus then refused to pay rent for the Car Wash.  (Fact 29, 169.)  This prompted Plaintiffs to begin eviction proceedings against Polus.  (Fact 29.)  On June 22, 2018, Yacoub contacted AMCO and advised that she wanted to pursue the claim related to the Fire Loss under the Policy.  (Fact 30, 180.)  Yacoub said she was out of the country and was in the process of evicting Polus and would not have access to the Property until July 10, 2018.  (Fact 31.)

Plaintiffs assert that, sometime in July 2018, Polus or his agents damaged the Property by changing the locks, spray painting, removing shelves, removing pumps and hoses, removing a door, and damaging electrical equipment, security equipment and Car Wash equipment. (Fact 33.) This is the alleged damage constituting the Vandalism Loss. Plaintiffs reported the Vandalism Loss to the Jamul Police Department on November 7, 2018. (Fact 34.)

Plaintiffs retained Hot Wax, a car wash equipment retailer, to inspect the Property and prepare an estimate for the repair of the damage to the Car Wash equipment. (Fact 36.) On September 14, 2018 and October 12, 2018, Brian Lutz, the president and owner of Hot Wax, inspected the Property. (Fact 37.) Amco submits a Declaration from Lutz, who states: "It was obvious from my inspection of the premises that the subject car wash equipment had not been maintained and the machinery overall was in poor condition with cracking plastic parts, corrosion at joints in pipes and visible rust in many areas." (Lutz Decl. ¶ 5, ECF No. 19-7.) Lutz states that "several pieces of the car wash equipment were in a state of disrepair totally unrelated to the fire," and "[a]lthough there was a Motor Control Center, Variable Frequency Drive and Tunnel Controller that were in control room that were damaged by the fire, all of the equipment needs replacing, not because it was damaged by the fire, but because the equipment is old and obsolete and poorly maintained." (*Id*. ¶¶ 6, 7.)

On September 4, 2018, Amco adjuster Johnson-Gray was permitted to inspect the Property. (Fact 42.) On November 1, 2018, Plaintiffs provided Amco with an estimate for repair of the Car Wash from their contractor, Vladic Construction, totaling more than $713,000. (Fact 209.) On November 6, 2018, a new AMCO adjuster, James Boles, was assigned to the Claims. (Fact 44.) Boles inspected the Property with Yacoub on November 13, 2018. (Fact 45.) On November 13, 2018, Boles spoke with Neil Dik of Frylit, a car wash component retailer who had performed the original installation of the Car Wash

5

equipment.[2]  (Fact 47.)  The Parties dispute when Plaintiffs provided Amco with copies of the lease and subleases at issue (Fact 100), however they agree that Plaintiffs first provided Amco with a copy of the Agreement on February 19, 2019.  (Fact 51.)

Polus tendered both the Fire Loss and the Vandalism Loss to his insurer, State Farm.[3]  (Fact 52, 53.)  State Farm investigated the Losses and ultimately paid Polus $278,586.36 for the damaged Car Wash systems, machinery and equipment and $66,742.00 for Polus' loss of business income.  (Fact 54.)  State Farm denied coverage for the Vandalism Loss in part because Polus did not have adequate documentation showing which items had been taken from the Property.  (Fact 55.)  Polus did not use any of the money he received from State Farm to repair the Car Wash.  (Yacoub Decl. ¶ 5, ECF No. 20-1.)

On July 18, 2019, Amco, via a letter from Boles, issued a partial coverage denial for the Fire Loss.  (Fact 56.)  Boles stated that "[t]he car wash equipment and other related trade fixtures damaged in the fire are not owned by you and are not COVERED PROPERTY as defined by the policy."  (Yacoub Decl., Ex. M at 3, ECF No. 18-3; *see also id*. at 6 ("You no longer had a financial interest in the car wash machinery and equipment as you sold that interest in the Purchase Agreement.").)  Boles also stated: "[T]he policy would exclude the damages to the car wash equipment and machinery being claimed outside of the controller room. That damage is not related to the fire, but is due to excluded causes of loss including wear, tear, rust, deterioration, neglect, mechanical breakdown, and faulty, inadequate and defective maintenance and repairs."  (*Id*. at 6.)  Boles finally stated that the business income claim was denied, apart from rent, because "[a]s you were not earning any net profit or loss related to the car wash and quick lube business operations prior to the loss, you would not earn them after the loss."  (*Id.*)

In total, Amco paid Plaintiffs $15,203.70 toward the Fire Loss: $8,603.70 for the undisputed damage to the "electrical room and roof system" caused by the fire and $6,600

---

[2] The contents of Boles' discussion with Dik and Plaintiffs' hearsay objection to this evidence are discussed below.

[3] Polus did not share Plaintiffs' belief about who was responsible for the Vandalism Loss.

for loss of rent for a "one month period of restoration." (Fact 60, 62; Yacoub Decl., Ex. M at 1, ECF No. 18-3; Boles Decl. ¶¶ 11, 22, ECF No. 19-10.) Amco asserts it paid that portion of the fire claim under the Policy that involved covered damage to the Car Wash building itself, including the replacement of the door to the car building, repairs to the Car Wash ceiling/roof framing, repairs to the building's roofing and stucco, and cleaning of the building's concrete walls and floors. (Fact 188.) Amco did not pay for repairs to the burned control panel and burned electrical lines running to the control panel. (Fact 189, 190.) Amco refused to pay for the control panel and electrical lines because Amco claimed that the entire electrical system for the Car Wash required replacement because of deferred maintenance, obsolescence and because the system had exceeded its useful life. (Fact 189, 190; Lutz Decl ¶ 7, ECF No. 19-7.)

On July 30, 2019, Amco, via a letter from Boles, issued a coverage denial for the Vandalism Loss. (Yacoub Decl., Ex. O, ECF No. 18-3.) Boles stated:

> The car wash equipment and other related trade fixtures and business personal property are not owned by you and are not COVERED PROPERTY as defined in the Policy. Further, the car wash equipment outside of the controller room which is not owned by you is damaged due to non-covered causes of loss including wear, tear, rust, deterioration, and lack of proper maintenance. The Business Income is not covered as it is not part of the Business Income covered loss as defined by the Policy.

(*Id.* at 2.) Boles also quoted the Policy's "dishonesty" and "entrustment" exclusions. (*Id.* at 4.) For those stated reasons, Amco did not pay the $38,501.90 it estimated for repairs for the Vandalism Loss. (Fact 204, 208.)

### C. Policy Provisions

Amco issued the Policy to Plaintiffs for the period effective December 20, 2017 to December 20, 2018. (Fact 68.) The Policy covers one insured location with four insured buildings, including the Car Wash building. (Fact 69.) For the Car Wash, the Building Limits are $1,158,000 and the Personal Business Property limits are $26,600. (Fact 70.) The Policy's commercial property coverage provides in pertinent part:

> We will pay for direct physical loss of or damage to Covered Property...
> caused by or resulting from any Covered Cause of Loss.
> Covered Property includes Buildings as described under paragraph a. below,
> Business Personal Property as described under paragraph b. below, or both....
> a.   Buildings, means the described buildings and structures at the described
> premises, including:
> > (1) Completed additions;
> > (2) Fixtures, including outdoor fixtures;
> > (3) Permanently installed:
> > > (a) Machinery;
> > > (b) Equipment; and
> > > (c) Tanks, including pumps.
> b.  Business Personal Property, located in or on the buildings or structures at
> the described premises ... consisting of the following:
> > (1) Personal property you own that is used in your business, including
> > but not limited to furniture, machinery, equipment and "stock" …

(Fact 71.)

The Policy states that "[t]his Coverage Form insures against Risks of Direct Physical Loss unless the loss is … [e]xcluded in Section B. EXCLUSIONS…." (*Id*.)  Relevant to the Losses, the Policy contains "wear and tear," "negligent maintainence" and "dishonesty/entrustment" exclusions, which provide in relevant part:

> 2. We will not pay for loss or damage caused by or resulting from any of the
> following:
> > …
> f. Dishonesty
> Dishonest or criminal acts by... anyone with an interest in the property...
> or anyone to whom you entrust the property for any purpose:
> > (1)  Acting alone or in collusion or with others; or
> > (2) Whether or not occurring during the hours of employment.
> > …
> l. Other Types Of Loss
> > (1) Wear and tear;
> > (2) Rust or other corrosion, decay, deterioration, hidden or latent
> > defect or any quality in property that causes it to damage or
> > destroy itself;
> > …
> 3.  We will not pay for loss or damage caused by or resulting from … B.3.c.
> But if an excluded cause of loss that is listed in … B.3.c. results in a Covered

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

    c.  Negligent Work
    Faulty, inadequate or defective:

        ...
    Maintenance;
    of part or all of any property on or off the described premises.

(Fact 72.)

### D. Litigation

On January 14, 2020, Plaintiffs initiated this action by filing a Complaint in this Court.  (ECF No. 1.)  The Complaint alleges two causes of action: breach of contract and breach of the implied covenant of good faith and fair dealing.  The Complaint seeks damages, including punitive damages.

On February 12, 2021, the Parties filed the Cross-Motions.  (ECF Nos. 18, 19.)  In Plaintiffs' Motion for Partial Summary Judgment, Plaintiffs request an order holding that Amco "breached the subject policy issued by Amco to Plaintiffs as a matter of law by failing to pay contractual benefits due under the policy because Plaintiffs owned the Car Wash and Oil Change leasehold improvements at the time of loss."  (Pls.' Moving Br. at 1, ECF No. 18.)  Plaintiffs contend that their "loss includes $1,041,339.24 for repair of property damage" and "Plaintiffs will prove the full extent of their damages from Amco's breach of the Policy and breach of the covenant of good faith and fair dealing at trial."  (*Id*. at 25.)  In Amco's Motion for Summary Judgment, Amco moves for summary judgment as to each of Plaintiffs' two claims.  (Amco Moving Br. at 2, ECF No. 19.)

On April 14, 2021, the Parties filed their respective oppositions to the Cross-Motions (ECF Nos. 20, 21), and on April 23, 2021, the Parties filed their replies (ECF Nos. 26, 27).  On May 3, 2021, the Court conducted oral argument on the Cross-Motions.  (ECF No. 30.)

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, a party may move for summary judgment as to a claim or defense or part of a claim or defense.  Fed. R. Civ. P. 56(a).  Summary

judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Although materiality is determined by substantive law, "[o]nly disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986).  A dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  When considering the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party.  *Celotex*, 477 U.S. at 323.  The moving party may meet this burden by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.*  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quotation omitted).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial. *Celotex*, 477 U.S. at 324.  This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, to survive summary judgment, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324; *see also Anderson*, 477 U.S. at 248.  Accordingly, the non-moving party cannot oppose a properly supported

summary judgment motion by "rest[ing] upon mere allegations or denials of his pleading." *Anderson*, 477 U.S. at 256.

"In reviewing cross-motions for summary judgment, each motion must be considered on its own merits." *Acosta v. City Nat'l Corp.*, 922 F.3d 880, 885 (9th Cir. 2019) (quotation omitted). "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion." *Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quotation omitted). The Court must "consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015).

## III.   Analysis

The Court will first consider Amco's Motion for Summary Judgment and then consider Plaintiffs' Motion for Partial Summary Judgment.

### A. Amco's Motion for Summary Judgment

Amco moves for summary judgment on the breach of contract cause of action, contending that Amco appropriately denied policy benefits because Plaintiffs did not own the Car Wash systems and machinery at the time of the Losses, and coverage for the Losses is barred by the wear and tear exclusion, the negligent maintenance exclusion, and the dishonesty/entrustment exclusion. Amco also contends that it is entitled to summary judgment on the cause of action for breach of the implied covenant of good faith and fair dealing "because Plaintiffs have failed to produce any competent evidence that Amco acted unreasonably in handling Plaintiffs' property damage claims because there was genuine dispute regarding the scope of coverage afforded under the Amco policy for Plaintiffs'

property damage claims." (Amco Moving Br. at 2, ECF No. 19.)   Each of these arguments will be addressed in turn.[4]

### 1. Breach of Contract Cause of Action

#### a. General Legal Principles

Jurisdiction in this case is based upon diversity, and the Parties agree that the interpretation of the Policy and the Agreement are governed by California law. *See, e.g.*, *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (applying California insurance law in diversity case).

"Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation." *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 647 (2003) (citation omitted); *see also Great Minds v. Office Depot, Inc.*, 945 F.3d 1106, 1110 (9th Cir. 2019) ("Under California law, the interpretation of contract language is a question of law.") (quotation omitted).   The goal of such interpretation is to "give effect to the 'mutual intention' of the parties." *MacKinnon*, 31 Cal. 4th at 647 (citing Cal. Civ. Code § 1636).   A contract's provisions are given their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage." *Id.* at 647-48 (citting, *inter alia*, Cal. Civ. Code §§ 1638, 1644). "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable.   But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract." *Id.* at 648 (quoting *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995)); *see also Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1042–43 (9th Cir. 2020) ("[M]ost importantly, '[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.'") (quoting Cal.

---

[4]  Amco also contends that it is entitled to summary judgment on Plaintiffs' request for punitive damages.  Plaintiffs respond by stating that "Plaintiffs no longer pursue their claim for punitive damages and agree to dismissal of their punitive damages only." (Pls.' Opp'n Br. at 21, ECF No. 20.) Accordingly, the Court need not address the merits of Plaintiffs' request for punitive damages.

Civ. Code § 1641).  "[W]here contract language is ambiguous and unresolved by the more fundamental principles of interpretation," "ambiguous contract provisions should be construed against the drafter." *Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1042 (9th Cir. 2020) (citing, *inter alia*, Cal. Civ. Code § 1654).

"[I]nsurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured, whereas exclusionary clauses are interpreted narrowly against the insurer." *MacKinnon*, 31 Cal. 4th at 648 (quotation omitted).  "[A]n insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear…. [T]he burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language." *Id.* (quotations omitted).  "The burden is on the insured to establish that the claim is within the basic scope of coverage and on the insurer to establish that the claim is specifically excluded." *Id.* (citation omitted).  However, "[i]n the absence of any ambiguity, the courts have no alternative but to give effect to the contract of insurance as executed by the parties.  Accordingly, when the terms of the policy are plain and explicit the courts will not indulge in a forced construction so as to fasten a liability on the insurance company which it has not assumed." *First Am. Title Ins. Co. v. XWarehouse Lending Corp.*, 177 Cal. App. 4th 106, 115 (2009) (quotation omitted).

### b.  Insurable Interest

"In order to recover on an insurance policy, an individual must have '[a]n insurable interest in the property insured….  An interest in the property insured must exist when the insurance takes effect and when the loss occurs." *Liberty Mut. Fire Ins. Co. v. McKenzie*, 88 Cal. App. 4th 681, 689 (2001) (citing *Int'l Serv. Ins. Co. v. Gonzales*, 194 Cal. App. 3d 110, 117–18 (1987)); *see also* Cal. Ins. Code §§ 280, 286.  "An insurable interest exists when the insured has a direct pecuniary interest in the preservation of the property and will suffer a pecuniary loss as an immediate and proximate result of its destruction." *Int'l Serv. Ins. Co.*, 194 Cal. App. 3d at 118.  For example, in *McKenzie*, the court found that "[t]he predicate of an insurable interest in each Liberty policy is that the insured … owned the vehicle." *McKenzie*, 88 Cal. App. 4th at 689.

### i.  Contentions of the Parties

Amco contends that "Plaintiffs did not own the subject car wash systems and other equipment at the time of the Losses."  (Amco Moving Br. at 16, ECF No. 27.)   Amco contends:

> On its face, the Agreement specifically and expressly states that Plaintiffs conveyed 'all assets of the CAR WASH ... including ... machinery, ... car wash systems, and other equipment.'    Interpreting the term 'leasehold improvements'—which were not conveyed—to mean 'car wash systems' would be contrary to the express language including 'car wash systems' as assets included in the sale.  Moreover, to the extent that there is any ambiguity in the Agreement with respect to what constitutes a 'leasehold improvement,' the ambiguity would be construed against drafter—Plaintiffs and their counsel.

(*Id*. at 16-17 (citing *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990); Cal. Civ. Code § 1654).)  Amco also contends that "[p]ursuant to the custom and practice of the commercial real estate industry, the term 'leasehold improvements' means improvements that are part of the building and are made on behalf of the new tenant—'leasehold improvements' are not removable fixtures, furniture or equipment … that existed when the lease and the Agreement were entered into by the parties." (*Id*. at 17.)  Amco states that it "does not foreclose the possibility that [Plaintiffs and Hermiz] agreed to intentionally understate the value the trade fixtures and equipment [in the Agreement] to avoid certain tax implications associated with the sale of the Car Wash and Quick Lube." (*Id*. at 17-18.)

Plaintiffs respond that "Amco breached the Policy by contending Plaintiffs did not own the car wash equipment to the exclusion of other evidence of the 'leasehold improvements' retained by Plaintiff" in the Agreement.  (Pls.' Opp'n Br. at 11, ECF No. 20.)   Plaintiffs contend that the Agreement excludes leasehold improvements, which include all machinery and equipment bolted or attached to the building.  (*Id*. at 12.) Plaintiffs point to the low value assigned to the "Trade Fixtures and Equipment" in the Agreement as evidence that Hermiz and Plaintiffs considered the vast majority of the Car Wash machinery, fixtures and equipment to be "leasehold improvements."  (*Id*. at 11.)

Plaintiffs contend that the "county tax records reflect that Yacoub paid taxes only on real property improvements," which "include the increased … assessment on the leasehold improvements from the cost of $150,000 to about $495,000 in [2005], reflecting the addition of the Car Wash improvements." (*Id.*) Plaintiffs point out that they paid the county tax assessments on the "Car Wash improvements" before and after the sale to Hermiz. (*Id.*) Plaintiffs submit Declarations from Hermiz and Yacoub asserting their "understanding that … Yacoub retained ownership of all attached car wash machinery, equipment, systems and tanks…." (Hermiz Decl. ¶ 4, ECF No. 18-1; Yacoub Decl. ¶ 15, ECF No. 18-3).

### ii.  Language of the Agreement

The Parties agree that determining whether Plaintiffs have an insurable interest involves examination of the Agreement to determine whether ownership of the Car Wash machinery was sold to Hermiz or retained by Plaintiffs.[5] (Pls.' Moving Br. at 15, ECF No. 18; Amco Moving Br. at 16-17, ECF No. 27.) "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. Such intent is to be inferred, if possible, solely from the written provisions of the contract." *AIU Ins. Co. v. Superior Ct.*, 51 Cal. 3d 807, 821–22 (1990) (citing Cal. Civ. Code §§ 1636, 1639). "The clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage, controls judicial interpretation." *Id*. at 822 (quotations omitted).

---

[5] Plaintiffs do not argue that the property at issue would constitute "Covered Property" under the Policy regardless of whether that property had been transferred to Polus under the Agreement, because the property was "permanently installed" within the meaning of the Policy. (Fact 71.) Accordingly, such an argument is waived. Even if Plaintiffs had not waived the argument, it would be unavailing because the only evidence in the record regarding whether the installation of the machinery was permanent comes from Amco's expert who examined the premises and opined that "[a]ny furniture, equipment, machinery, car wash equipment, inventory or racking which … had been … present at the Premises are not considered leasehold improvements nor have been permanently installed." (Pagliassotti Decl. ¶ 5, ECF No. 19-5.)

1

The Agreement states:

BUYER [sic] is transferring all assets of the CAR WASH and QUICK LUBE, including, but not limited to, inventory, machinery, furniture, trade fixtures, car wash systems, and other equipment, fictitious business names, trade names, logos, signs, and goodwill.  Provided, however, that leasehold improvements are not part of the AGREEMENT, and SELLER shall retain all ownership of said leasehold improvements.  Also included are the tanks used to collect and recycle the water used in the car wash system.

(Fact 9.)[6]  The Agreement does not define "leasehold improvements" or any of the other quoted terms, such as "machinery," "trade fixtures," "car wash systems," or "equipment."

Amco argues that the plain meaning of the above-quoted language is that the "inventory, machinery, … trade fixtures, car wash systems, and other equipment" were transferred to Hermiz, as stated in the first sentence.  Amco argues that "leasehold improvements"—which are not transferred per sentence two—logically does not include "machinery, … trade fixtures, car wash systems, and other equipment," since they are given as express examples of the assets transferred in the Agreement.  Plaintiffs argue that essentially all of the Car Wash systems and machinery constitute "leasehold improvements," and they point to the fact that the Agreement assigns a low dollar value to the "Trade Fixtures & Equipment" ($4,500 in the Agreement, later amended to $1229.85)—despite the Car Wash containing machinery, equipment, and/or systems purchased for approximately $285,000 in 2002.

The Court finds that, when examining the above-quoted language, it is unreasonable to assume that the specific examples of assets expressly being transferred (i.e., "machinery, … trade fixtures, car wash systems, and other equipment") were in fact *not* being transferred.  Such an interpretation, as advanced by Plaintiffs, would render most of the specific examples listed in sentence one meaningless.  The Court must avoid such an interpretation if possible.  *See, e.g.*, *Zalkind v. Ceradyne, Inc.*, 194 Cal. App. 4th 1010,

---

[6] The Parties assume that the above-quoted reference to "BUYER" was intended to be "SELLER."  The Court assumes likewise.

1027 (2011) ("To the extent practicable, the meaning of a contract must be derived from reading the whole of the contract, with individual provisions interpreted together, in order to give effect to all provisions and to avoid rendering some meaningless.") (citations omitted).

Similarly, the third sentence in the above-quoted "transferring all assets" paragraph states: "Also included are the tanks used to collect and recycle the water used in the car wash system." (Fact 9.)  As with nearly all of the other Car Wash systems and machinery, the allocation section (and the subsequent Bill of Sale) does not include these Car Wash tanks and Plaintiffs contend that Plaintiffs retained ownership of the tanks.  (*See* Yacoub Decl. ¶ 15, ECF No. 18-3.)  Thus, Plaintiffs' strained reading of the Agreement would again negate a specific, unambiguous example of an item being transferred.  The Court must avoid such a reading if practicable.  *See Zalkind*, 194 Cal. App. 4th at 1027.

Turning to the allocation section of the Agreement, a dollar value of $4,500 is assigned to the "Trade Fixtures & Equipment," which was later reduced to $1229.85—only $46.30 of which related to the Car Wash.  Such a low dollar value might indicate that the terms "Trade Fixtures & Equipment" were "used by the parties in a technical sense or a special meaning is given to them by usage."  *AIU Ins. Co.*, 51 Cal. 3d at 822.  The Agreement itself hints that the purpose for the low value assigned to "Trade Fixtures & Equipment" is related to sales tax: "BUYER to pay sales taxes as a result of this sale of business, on the value of the fixtures and equipment specified herein." (Hermiz Decl., Ex. A at 2, ECF No. 18-1.)

And regardless of whether the low value assigned to "Trade Fixtures & Equipment" is tax related, the allocation section of the Agreement does not mention "leasehold improvements."  Nowhere in the Agreement is there an indication that "leasehold improvements" is given a special meaning, such as the expansive meaning advocated by Plaintiffs.  Likewise, there is no indication in the Agreement that a special, restrictive meaning is given to the other listed examples of assets expressly being transferred, such as "machinery" or "car wash systems."  There is no indication that the allocation section of

the Agreement is intended to negate, retract or drastically narrow the broad, unambiguous language stating that Plaintiffs were "transferring all assets of the CAR WASH and QUICK LUBE, including, but not limited to, inventory, machinery, furniture, trade fixtures, car wash systems, and other equipment…."  (Fact 9.)

Accordingly, the Court finds no ambiguity in the provision expressly stating that all machinery and car wash systems were being transferred, even when reading the Agreement as a whole, including the allocation section.  *Cf. Int'l Bhd. Of Teamsters*, 957 F.3d at 1044 ("[C]ourts will not strain to create an ambiguity where none exists," nor is "[t]he language of a contract ... made ambiguous simply because the parties urge different interpretations.") (citing, *inter alia*, *Waller*, 11 Cal. 4th at 18–19).

The Court's finding is supported by the language of the Sublease, which was referenced in the Agreement and signed by Yacoub and Hermiz on the same day.  *Cf. Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1269 (9th Cir. 2017) ("Under California law, a contract and a document incorporated by reference into the contract are read together as a single document.") (citations omitted).  In the section of the Sublease entitled "Alterations and Improvements," the parties agreed that Hermiz would "make no other improvements on the demised premises without the prior written consent of Sublessor." (Fact 12.)  This language seems to be at odds with Plaintiffs' expansive view that the category of "leasehold improvements" consists of virtually every piece of equipment and machinery in the Car Wash.  According to Plaintiffs' view, Hermiz would have to obtain Plaintiffs' prior written consent to add or replace almost any piece of equipment or machinery relating to the Car Wash or Quick Lube.  It is difficult to believe this is what the parties intended.

The Court finds that the language of the Agreement unambiguously supports Amco's interpretation that all machinery and car wash systems were transferred from Yacoub to Hermiz.

### b.  Extrinsic Evidence

"The decision whether to admit parol evidence involves a two-step process.  First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party.  If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract."  *F.B.T. Prods., LLC v. Aftermath Recs.*, 621 F.3d 958, 963 (9th Cir. 2010) (quoting *Winet v. Price*, 4 Cal. App. 4th 1159, 1165 (1992)).

The Court has provisionally received and considered the extrinsic evidence submitted by the Parties.  For the reasons discussed below, even considering this extrinsic evidence, the language of the Agreement is not "reasonably susceptible" to the interpretation urged by Plaintiffs.

Plaintiffs rely upon affidavits by Hermiz and Yacoub asserting their subjective "understanding that … Yacoub retained ownership of all attached car wash machinery, equipment, systems and tanks."  (Hermiz Decl. ¶ 4, ECF No. 18-1; Yacoub Decl. ¶ 15, ECF No. 18-3.)   However, the words of the Agreement controls; statements of the subjective understanding of the parties cannot inject ambiguity into an otherwise unambiguous contract.  *See Global Packaging, Inc. v. Superior Ct.*, 196 Cal. App. 4th 1623, 1634 (2011) ("Under California law, contracts are interpreted by an objective standard; the words of the contract control, not one party's subjective intentions.") (citing *Brant v. Cal. Dairies, Inc.*, 4 Cal. 2d 128, 133 (1935) ("[I]t is now a settled principle of the law of contract that the undisclosed intentions of the parties are, in the absence of mistake, fraud, etc., immaterial; and that the outward manifestation or expression of assent is controlling.")); *Essex Ins. Co. v. Heck*, 186 Cal. App. 4th 1513, 1525 n.2 (2010) ("Essex's unexpressed subjective intent with respect to allocation of the settlement payment is irrelevant to the proper interpretation of the settlement agreement.").

Moreover, the Parties agree that the tax evidence establishes that Polus paid taxes on the business personal property while Yacoub paid taxes only on the real property

improvements.  (Facts 79-80.)  Amco submits a declaration from John Pagliassotti, a purported expert in commercial real estate who inspected the premises and the contracts at issue and opined that the custom and practice in the commercial real estate industry is that "the leasehold improvements at the Premises consist of the actual building structure (shell) and the offices, storage rooms, utility rooms, restrooms, basement/pits contained therein and the surrounding parking areas." (Pagliassotti Decl. ¶ 4, ECF No. 19-5.)  Pagliassotti opined that "[a]ny furniture, equipment, machinery, car wash equipment, inventory or racking which … had been … present at the Premises are not considered leasehold improvements nor have been permanently installed.  Such items are generically referred to as FF&E (furniture, fixtures and equipment)."  (*Id*. ¶ 5.)  Plaintiffs do not challenge Pagliassotti's expertise or present contrary evidence concerning the custom and practice in commercial real estate.  The tax evidence is consistent with Pagliassotti's (and Amco's) view of the transaction, i.e., Yacoub paid taxes only on "improvements" as that term is understood in the commercial real estate industry and Polus paid taxes on the business personal property or "FF&E." (*Id*. ¶ 17.)

Plaintiffs also point to the 2003 ground lease between Rodriguez and Plaintiffs, which refers to the car wash and oil and lube bays and appurtenant parking areas as the "improvements." (Fact 119.)  The ground lease also provides that, upon termination of the ground lease, the permanent buildings and related leasehold improvements shall stay, while Plaintiffs may, if not in default, remove inventory and fixtures which are personal property and not permanently affixed to the real estate.  (Fact 120.)  However, as discussed above, Pagliassotti opined that "[a]ny … equipment, machinery, car wash equipment, inventory or racking which … had been … present at the Premises are not considered leasehold improvements nor have been permanently installed." (Pagliassotti Decl. ¶ 4, ECF No. 19-5.)  Plaintiffs have failed to challenge or counter this evidence with evidence of their own sufficient to create an issue of fact as to whether any machinery or other Car Wash systems were permanently installed.

Finally, the Agreement states that Yacoub "shall comply with the Bulk Sales provision … of the California Uniform Commercial Code, … as the law is applicable in California." (Agreement at 3, Ryan Decl., Ex. E, ECF No. 19-15.)  Amco and Plaintiffs agree that Plaintiffs' sale to Hermiz constituted "a 'Bulk Sale' in accordance with the California Uniform Commercial Code, sections 6101, *et seq*." (Fact 7.)  In order to qualify as a "bulk sale" under California's Uniform Commercial Code, the sale of the seller's business must be "more than half of the seller's inventory and equipment, as measured by value on the date of the bulk-sale agreement." Cal. Com. Code § 6102(3); *see Schnyder v. State Bd. of Equalization*, 101 Cal. App. 4th 538, 543 (2002).  This definition is at odds with Plaintiffs' view that only $46.30 of Car Wash equipment was being transferred to Hermiz despite Plaintiffs owning Car Wash equipment originally purchased for approximately $285,000.  (*See* Pagliassotti Decl. ¶ 14, ECF No. 19-5.)  By contrast, § 6102(3)'s definition of "bulk sale" is entirely consistent with Amco's view that Plaintiffs were, in the words of the Agreement, "transferring all assets of the CAR WASH and QUICK LUBE, including, but not limited to, inventory, machinery, furniture, trade fixtures, car wash systems and other equipment, fictitious business names, trade names, logos, signs, and goodwill." (Fact 9.)

The Court finds that, provisionally admitting and considering the extrinsic evidence submitted by the Parties, the language of the Agreement is not "reasonably susceptible" to the interpretation urged by Plaintiffs.  *F.B.T. Prods.*, 621 F.3d at 963.  And even if it were proper to fully admitted the extrinsic evidence submitted by the Parties, it would not alter the Court's ultimate finding.  If the language of the Agreement was ambiguous, the Court would arrive at the final rule of construction which states that "ambiguous contract provisions should be construed against the drafter." *Int'l Bhd. of Teamsters*, 957 F.3d at 1042; *see also Mayhew v. Benninghoff*, 53 Cal. App. 4th 1365, 1370 (1997) ("[T]he doctrine of contra proferentem (construing ambiguous agreements against the drafter) applies with even greater force when the person who prepared the writing is a lawyer.").

There is no dispute that Plaintiffs' attorney drafted the Agreement. (Fact 86.) Therefore, the Court would construe the Agreement against Plaintiffs.

The Court finds that, as a matter of law, Plaintiffs have failed to show that they have an insurable interest in the items alleged to constitute the unpaid Losses. For this reason alone, Amco's Motion for Summary Judgment as to the breach of contract cause of action must be granted. The Court nonetheless considers Amco's alternative contention that summary judgment is appropriate due to application of the relevant Policy exclusions.

### c. Exclusions

Amco contends that coverage for the Losses is barred by the wear and tear exclusion and the negligent maintenance exclusion, and coverage for the Vandalism Loss is barred by the dishonesty/entrustment exclusion.

"An insurer is entitled to limit its coverage to defined risks, and if it does so in clear language, we will not impose coverage where none was intended." *Titan Corp. v. Aetna Cas. & Sur. Co.*, 22 Cal. App. 4th 457, 469 (1994). Once an insured satisfies its burden to "establish that the occurrence forming the basis of its claim is within the basic scope of insurance coverage," "the burden is on the insurer to prove the claim is specifically excluded." *Aydin Corp. v. First State Ins. Co.*, 18 Cal. 4th 1183, 1188 (1998). "[P]olicy exclusions are strictly construed." *E.M.M.I. Inc. v. Zurich Am. Ins. Co.*, 32 Cal. 4th 465, 471 (2004) (citations omitted). "An insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear," and "any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect." *Id.* (quotation omitted).

As discussed above, the Court finds that Plaintiffs have failed to meet their burden of "establish[ing] that the occurrence forming the basis of its claim is within the basic scope of insurance coverage." *Aydin Corp.*, 18 Cal. 4th at 1188. The Court will proceed to determine if, in the alternative, Amco has satisfied its burden of proving as a matter of law that the claimed Losses are specifically excluded.

### i. Wear and Tear and Negligent Maintenance Exclusions

The Policy's "wear and tear" exclusion states: "We will not pay for loss or damage caused by or resulting from any of the following: … Wear and tear." (Fact 72.) The "negligent maintenance" exclusion states:

> [B.] 3. We will not pay for loss or damage caused by or resulting from …
> B.3.c. But if an excluded cause of loss that is listed in … B.3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.
>    c. Negligent Work
>    Faulty, inadequate or defective:
>       ...
>       Maintenance;
>    of part or all of any property on or off the described premises.

(Fact 72.) These exclusions are in place so that insurance policies are not "convert[ed] into a maintenance agreement." *Murray v. State Farm Fire & Cas. Co.*, 219 Cal. App. 3d 58, 62 (1990).

Amco submits a Declaration from Brian Lutz, the owner of a company hired by Plaintiffs to provide a repair estimate. Lutz opined that the "car wash equipment had not been maintained and the machinery overall was in poor condition with cracking plastic parts, corrosion at joints in pipes and visible rust in many areas," "several pieces of the car wash equipment were in a state of disrepair totally unrelated to the fire," and "[a]lthough there was a Motor Control Center, Variable Frequency Drive and Tunnel Controller that were in control room that were damaged by the fire, all of the equipment needs replacing, not because it was damaged by the fire, but because the equipment is old and obsolete and poorly maintained." (Lutz Decl. ¶¶ 5, 6, 7, ECF No. 19-7.) Lutz stated that "automatic car wash equipment has a lifespan of anywhere between 15 to 20 years if it is properly maintained," but "if the equipment is not maintained, the lifespan is closer to 8 to 10 years." (Id. ¶ 8.) Lutz opined that, "[b]ecause the equipment in the Jamul Car Wash had not been maintained, it had exceeded its lifespan." (*Id.*) Amco also submits a Declaration from its claims specialist, James Boles, who states that he inspected the Car Wash and "observed that apart from the localized damage within the subject electrical control room, the car

wash and oil change equipment was not damaged by the fire but instead appeared to be in a state of disrepair and non-operational because it was old and poorly maintained." (Boles Decl. ¶ 7, ECF No. 19-10.)

Plaintiffs have submitted no evidence contradicting or disputing Amco's evidence from Lutz and Boles. In particular, Plaintiffs have submitted no evidence that the Car Wash was operational prior to the fire or was rendered non-operational by the fire or the vandalism. Given this evidentiary record, the Court finds that the exclusions at issue are "clear and unambiguous and expressly cover[] the damage claimed here." *Waldsmith v. State Farm Fire & Cas. Co.*, 232 Cal. App. 3d 693, 696–97 (1991) (quoting *Brodkin v. State Farm Fire & Cas. Co.*, 217 Cal.App.3d 210, 218 (1989)). The Court finds that, even if Plaintiffs had created an issue of fact as to whether they owned the Car Wash systems and machinery at issue, Amco has satisfied its burden of establishing as a matter of law that the "wear and tear" and/or "negligent maintenance" exclusions apply to specifically exclude the Losses.

### ii.    Dishonesty/Entrustment Exclusion

The Policy's dishonesty/entrustment exclusion states in relevant part: "We will not pay for loss or damage caused by or resulting from … [d]ishonest or criminal acts by... anyone with an interest in the property... or anyone to whom you entrust the property for any purpose…." (Fact 72.)

In *Bita Trading, Inc. v. Nationwide Mutual Ins. Co.*, No. 13CV1548-JM-WVG, 2015 WL 433557 (S.D. Cal. 2015), *aff'd*, 675 F. App'x 692 (9th Cir. 2017), the plaintiff/insured entered into a lease with a car wash company for the construction and operation of a car wash. *Id.* at *1. Due to a dispute between plaintiff and the car wash company, the lease was terminated. *Id.* When plaintiff's property managers entered the premises, they discovered that fixtures had been stolen and the building had been damaged by the car wash company tenant. *Id.* at *1-*2. Plaintiff submitted a property loss claim to its insurer for the loss due to theft and vandalism. Nationwide denied the portion of the property damage claim "caused by theft and/or dishonest acts of persons to whom the property was

entrusted."   *Id*. at *2.   The insurance policy at issue contained the same dishonesty/entrustment exclusion as the Policy at issue in this case.  *Id*. at *6.  The court granted summary judgment for the insurer because it found "substantial evidence establishing that [the car wash company/lessee] and its agents were the parties responsible for the damages caused to the property [and holding that plaintiff]'s claims are barred by the Entrustment Exclusion." *Id*. at *7.  In so holding, the court rejected plaintiff's argument "that [the insurer] must both establish the identity of the actor and that the actor had criminal intent to remove the property." *Id*. at *5.  The court stated that, "[u]nder California law, the theft exclusion applies even if the actor is unknown and criminal intent not shown." *Id*. (citing *Granger v. New Jersey Ins. Co.*, 108 Cal. App. 290, 294–95 (1930) ("It may well be that in a prosecution for a crime, the strict rules of criminal law would require the swindler to be charged with the particular crime that the facts constitute, but it cannot be said that the contract of insurance was drawn to fit the narrow limitations of criminal statutes.")).

In this case, with respect to the Vandalism Loss, Plaintiffs contend that their subtenant Polus removed property and damaged property belonging to Plaintiffs.  As discussed above, the unambiguous language of the Agreement belies Plaintiffs' claim that Plaintiffs owned the property removed by Polus.  But even if Plaintiffs had created an issue of fact as to the issue of ownership, then the dishonesty/entrustment exclusion would bar Plaintiffs' Vandalism Loss claim.  In other words, the Vandalism Loss claim is contingent on the Polus taking and/or damaging property that did not belong to him.

Plaintiffs were in the process of evicting Polus when Plaintiffs contend Polus removed or damaged the property.  (Fact 31, 33.)  Plaintiffs reported the Vandalism Loss to the police.  (Fact 34.)  These facts are remarkably similar to those that warranted summary judgment in *Bita Trading*.  The Court finds that Amco has submitted sufficient evidence to satisfy its burden of production at the summary judgment stage.  *See, e.g.*, *C.A.R. Transp. Brokerage Co.*, 213 F.3d at 480.

The burden then shifts to Plaintiffs to identify specific facts showing that there is a genuine dispute for trial.  *See, e.g.*, *Celotex*, 477 U.S. at 324.  Plaintiffs speculate that Polus might have unintentionally damaged the Car Wash.  (Pls.' Opp'n Br. at 17, ECF No. 20 ("To the extent Polus or his agents gutted, broke or *unintentionally* damaged the Car Wash and Oil Change improvements coverage would apply.") (emphasis added)).  However, Plaintiffs offer no evidence to support the speculation that the Polus' actions were unintentional.  (*See* Fact 33 ("Polus or his agents damaged the Property by changing the locks, spray painting, removing shelves and pumps and house, removing a door, and damaging electrical, security and Car Wash equipment.").)  Once the summary judgment burden shifted to Plaintiffs, they were required to "more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  And as the court found in *Bita Trading*, "[u]nder California law, the theft exclusion applies even if the actor is unknown and criminal intent not shown."  2015 WL 433557, at *5.  Plaintiffs have failed to produce evidence sufficient to defeat summary judgment on this issue.

Accordingly, the Court finds that, even if Plaintiffs had created an issue of fact as to whether they had an insurable interest and even if Amco had failed to show that the "wear and tear" and/or "negligent maintenance" exclusions applied, Amco has satisfied its burden of establishing as a matter of law that the "dishonesty/entrustment" exclusion applies to exclude the Vandalism Loss.

> ### d.   California Code of Regulations, Title 10, Section 2695.9(d)

In their opposition brief, Plaintiffs appear to argue that summary judgment should be denied on the basis that Plaintiffs and Amco each prepared repair estimates for the Losses in November 2018 and "the moment an insured obtains a repair estimate that exceeds the insurer's estimate, the insurer must either pay the difference or adjust its original estimate."  (Pls.' Opp'n Br. at 13, ECF No. 20.)  In support of this assertion, Plaintiffs cite California Code of Regulations, title 10, section 2695.9(d), which sets forth procedures for when "losses are settled on the basis of a written scope and/or estimate

prepared by or for the insurer."[7]   Plaintiffs cite no caselaw or other authority to further support or explain this argument.

While Plaintiffs' argument with respect to section 2695.9(d) is unclear,[8] the Court finds that it does not prevent summary judgment as to Plaintiffs' breach of contract claim. Although Amco did pay a portion of the Losses, the amount of that payment is not in dispute.  The dispute here centers on the denial of coverage for the unpaid Losses on the basis that Plaintiffs did not own the Car Wash systems and machinery at issue and/or the unpaid Losses are excluded by applicable exclusions, as discussed above.  Amco expressly advised Plaintiffs that it was investigating coverage for the Losses under a reservation of rights, including the right to deny coverage.   (Boles Decl. ¶ 5, ECF No. 19-10.)  Amco had repair estimates prepared in November 2018 and Plaintiffs did not produce the

---

[7] Section 2695.9(d) states:
> If losses are settled on the basis of a written scope and/or estimate prepared by or for the insurer, the insurer shall supply the claimant with a copy of each document upon which the settlement is based…. If the claimant subsequently contends, based upon a written estimate which he or she obtains, that necessary repairs will exceed the written estimate prepared by or for the insurer, the insurer shall:
> > (1) pay the difference between its written estimate and a higher estimate obtained by the claimant; or,
> > (2) if requested by the claimant, promptly provide the claimant with the name of at least one repair individual or entity that will make the repairs for the amount of the written estimate. The insurer shall cause the damaged property to be restored to no less than its condition prior to the loss and which will allow for repairs in a manner which meets accepted trade standards for good and workmanlike construction at no additional cost to the claimant other than as stated in the policy or as otherwise allowed by these regulations; or,
> > (3) reasonably adjust any written estimates prepared by the repair individual or entity of the insured's choice and provide a copy of the adjusted estimate to the claimant.
> Cal. Code Regs., tit. 10, § 2695.9(d).

[8] Amco labels this argument an "unpled waiver/estoppel coverage theory."  (Amco Reply Br. at 4, ECF No. 27.)  Given that Plaintiffs never use any variation of the words "waiver" or "estoppel" and fails to address the elements necessary to establish either doctrine, the Court declines to read this argument to raise such issues. However, if Plaintiffs intended to raise waiver or estoppel theories, the Court would find those theories have been waived because they are not pleaded in the Complaint or adequately raised in the briefing.  Even if they were adequately pleaded and raised, insureds may not use such doctrines to "obtain coverage under existing insurance policies for claims not covered by the terms of their policies." *Dones v. Life Ins. Co. of N. Am.*, 55 Cal. App. 5th 665, 678 (2020).

Agreement to Amco until February 2019 despite repeated requests for such contracts.  (Fact 51; Boles Decl. ¶¶ 13-14, ECF No. 19-10.)  Therefore it appears that it was Plaintiffs' delay in producing the Agreement that resulted in Amco raising the ownership issue after the estimates were prepared.  Finally, the unpaid Losses were never "settled," and section 2695.9(d)—which supplies the procedure for when "losses are *settled* on the basis of a written scope and/or estimate prepared by or for the insurer"—simply does not apply in this case.  For these reasons, the Court finds that Plaintiffs' section 2695.9(d) argument does not prevent summary judgment as to Plaintiffs' breach of contract claim.

In summary, for the reasons stated above, the Court finds that Amco's Motion for Summary Judgment should be granted as to Plaintiffs' cause of action for breach of contract because Plaintiffs did not own the Car Wash systems and machinery at the time of the Losses, and coverage for the Losses is barred by the wear and tear exclusion, the negligent maintenance exclusion, and the dishonesty/entrustment exclusion.

### 2.  Bad Faith

Amco moves for summary judgment on the cause of action for breach of the implied covenant of good faith and fair dealing (also known as "bad faith") "because Plaintiffs have failed to produce any competent evidence that Amco acted unreasonably in handling Plaintiffs' property damage claims because there was genuine dispute regarding the scope of coverage afforded under the Amco policy for Plaintiffs' property damage claims."  (Amco Moving Br. at 2, ECF No. 19.)

"[T]he implied covenant of good faith and fair dealing … is based on the contractual relationship between the insured and the insurer."  *Waller*, 11 Cal. 4th at 36 (citation omitted).  "[T]he insurer owes its insured an independent duty to process all claims submitted to it in a reasonable manner, and not to delay, to the insured's prejudice, the ultimate decision to defend or indemnify."  *Id*.  "[T]o establish the insurer's 'bad faith' liability, the insured must show that the insurer has (1) withheld benefits due under the policy, and (2) that such withholding was 'unreasonable' or 'without proper cause.'"  *Major v. W. Home Ins. Co.*, 169 Cal. App. 4th 1197, 1209 (2009) (quoting *Gruenberg v.*

*Aetna Ins. Co.*, 9 Cal. 3d 566, 573-74 (1973)).  With respect to the first element, "a bad faith claim cannot be maintained unless policy benefits are due…." *Waller*, 11 Cal. 4th at 36 (quotation omitted).  This is because "[a]bsent that contractual right, … the implied covenant has nothing upon which to act as a supplement, and should not be endowed with an existence independent of its contractual underpinnings." *Id*. (quotation omitted).

The Court has found that Amco is entitled to summary judgment as to Plaintiffs' claim for breach of contract.  Because Amco has shown that there is no genuine issue of material fact as to whether Amco "withheld benefits due under the policy," *Major*, 169 Cal. App. 4th at 1209, Amco is likewise entitled to summary judgment as to Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.

Despite this finding, the Court nonetheless has examined the evidence offered in support of and in opposition to Amco's Motion for Summary Judgment as to Plaintiffs' bad faith claim.  Amco submits a declaration from a purported expert in claims handling, opining that Amco conducted a reasonably prompt and thorough investigation of the Losses.  (Hamilton Decl. ¶¶ 10-14, 23-26, ECF No. 19-6.)  Amco's expert further opines that Amco processed Plaintiffs' claims in a manner in compliance with prevailing industry custom and practice.  (*Id*. ¶¶ 12, 24.)  Plaintiffs have not challenged Amco's expert nor have Plaintiffs designated an expert or other evidence to rebut his opinions.  (Fact 80.)  Amco presents a declaration from its claims specialist James Boles, who states that he spoke with Neil Dik, a car wash component retailer, on November 13, 2018 about the Fire Loss.  (Boles Decl. ¶ 9, ECF No. 19-10.)  Dik told Boles that the Car Wash electrical system "was 15 years old and could not be repaired because it was obsolete."[9]  (*Id*.)

---

[9] Plaintiffs object to the evidence of Dik's statements on hearsay grounds.  (Pls.' Opp'n Br. at 9, ECF No. 20.)  Amco responds that the evidence is being offered for the purpose of showing that Amco relied on experts when investigating Plaintiffs' claim.  (Amco Reply Br. at 4, ECF No. 27 (citing *Fraley v. Allstate Ins. Co.*, 81 Cal. App. 4th 1282, 1293 (2000) (stating that whether the insurer relies on expert opinions is a factor in determining whether the insurer acted in bad faith)).  Because Dik's opinion is offered for the limited purpose of showing that Amco consulted with and relied on the opinion of an expert, the Court overrules Plaintiffs' hearsay objection.  *See, e.g.*, *Los Angeles News Serv. v. CBS*

Plaintiffs respond that Amco acted in bad faith because it "ignored indisputable facts (as to both claims) establishing that Plaintiffs own the Car Wash improvements at issue," "failed to interview Haitham Hermiz about the sale, failed to pull public property tax records, … and failed to respond to Plaintiffs' cost of repair." (Pls.' Opp'n Br. at 19, ECF No. 20.)  The Court finds that this evidence is insufficient to create an issue of fact as to whether Amco acted in bad faith.  It is undisputed that Plaintiffs did not provide Amco with the Agreement until February 2019, despite repeated requests for contracts demonstrating ownership.  (Fact 51; Boles Decl. ¶ 13, ECF No. 19-10.)  As discussed above, it was reasonable for Amco to question Plaintiffs' insurable interest in the unpaid Losses based upon the unambiguous language of the Agreement.  After receiving the Agreement, Amco promptly communicated with Plaintiffs and "raised questions about coverage for the Losses and specifically, the ownership of property…." (Boles Decl. ¶ 15, ECF No. 19-10.)  Amco specifically "ask[ed] for any information from Plaintiffs to support the position that Plaintiffs owned the … equipment on the date of loss." (*Id*. ¶ 16.)  There is no evidence Plaintiffs supplied any tax information or information from Hermiz.  Under these circumstances and given the unambiguous language of the Agreement, the Court finds that Amco's failure to interview Hermiz or search for tax records does not create an issue of fact as to the reasonableness of Amco's investigation.

In short, even if the Court had found an issue of fact that prevented summary judgment as to the claim for breach of contract, Amco would nonetheless be entitled to summary judgment as to Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.

Accordingly, Amco's Motion for Summary Judgment is granted in its entirety.

---

*Broad., Inc.*, 305 F.3d 924, 935 (9th Cir. 2002) ("Out-of-court declarations introduced to show the effect on the listener are not hearsay.").

Plaintiffs also object to Amco's reliance on certain statements made in a Verified Complaint filed by Polus against Plaintiffs in state court. (Pls.' Opp'n Br. at 9, ECF No. 20.)  The Court has not relied on any portion of Polus' Verified Complaint in considering the Cross-Motions.  Accordingly Plaintiffs' objections to the admissibility of Polus' Verified Complaint is overruled as moot.

### B. Plaintiffs' Motion for Partial Summary Judgment

The Court has reviewed all evidence submitted in support of, and in opposition to, Plaintiffs' Motion for Partial Summary Judgment.  (ECF Nos. 18, 21, 26.)  To the extent this evidence has not been discussed above or is not duplicative of the evidence submitted in relation to Amco's Motion for Summary Judgment (ECF Nos. 19, 20, 25, 27),[10] the Court finds that it does not alter the conclusions reached above.  For the reasons discussed above, Plaintiffs have failed to demonstrate that they are entitled to summary judgment as to either of their claims.  Accordingly, Plaintiffs' Motion for Partial Summary Judgment is denied.

## IV.    Conclusion

For the reasons discussed above, the Court **GRANTS** Amco's Motion for Summary Judgment (ECF No. 19) and **DENIES** Plaintiffs' Motion for Partial Summary Judgment (ECF No. 18).  The Clerk of the Court **SHALL ENTER JUDGMENT** for Amco and against Plaintiffs and close the case.

**IT IS SO ORDERED.**

Dated:  May 14, 2021

Honorable Todd W. Robinson
United States District Court

---

[10] The Amended Joint Statement of Undisputed Material Facts (ECF No. 25) was submitted in support of both Cross-Motions.

20-CV-97 TWR (WVG)